representing the appellant Mohamed Haroun Ali. I have two distinct claims that I hope to address. One is an action violation and the other is our claim that you have received a very real option from the police and accept to convict. Before you get into your argument, you sent us a 28-J letter, right? Yes, Your Honor. Something about the record and you found out these questionnaires never got to the district court or something like that. Explain that to me, will you? Okay. As far as I know, no court that has considered the Batson claim to date has looked at the juror questionnaires. Well, then, you see, we were under the impression that the district court had them because he said he looked them up. She said so. It's perfectly possible that's what she meant when she looked at everything that was in the record, which were, I think, just the two questionnaires for the two jurors that are at issue. So as far as I can tell, she didn't have them and nobody introduced them. It's not in the record and they're just not in the record and that's all there is to it. I don't see why we would now start supplementing the record as opposed to trying to get the record that was actually before her. Before I respond directly to that, let me say that I believe that unless the court is inclined to affirm this report, I don't think it's necessary to stop the pressing and get the juror. But as for what was in the record, this court's case law is very clear that where the review of the entire state record is necessary and the parties have failed to supply the court with that record, the district court has the duty to obtain it for itself. Now, the court's facts and cases make it clear. And the Supreme Court's facts and cases make it clear that you cannot definitively find that there was no comparative, that there was no error based on a comparative juror analysis. That's really the point of your letter, isn't it? That you're suggesting that the lack of those questionnaires being in the district court record sort of forecloses our options and really forecloses the foreclosure district court options in terms of who we can do with this case on this record. That's correct. I believe that the court's options are either to reverse based on based on the record that's before it, which I believe is ample for that purpose, or to remand to the district court with instructions to follow the direction given in Jones v. Wood and make sure that it has a complete record and reviews all of the questionnaires and all of the other material pertaining to the Batson violation. Isn't it counsel's obligation to say the questionnaires were, I'm talking about appellate counsel, the questionnaires were part of the record on appeal? The problem, Your Honor, is that at the time that this case was before the court of appeal, the California court of appeal, and particularly the first district, refused to engage in comparative juror analysis, which is what the questionnaires were pertinent to. And specifically, if you look at Boyd v. Newland, what Boyd v. Newland was about was that that same court refused to include in its appellate record juror questionnaires for precisely that reason. The fact is that when we were before the California court of appeal, it was a dead letter to try and get the juror questionnaires. The court of appeal would have said they have no proof and we will not expand the record to include them. So to go on to your other point, which is we could have, in your view, grant the petition on the current record, could you tell me what the two or three quarrels that you have with the district court's analysis that lead to that conclusion? Well, yes, I believe that I can. The district court agreed that she had to do comparative analysis. That's right. And I don't understand the government at this point to be contesting that. That's my understanding. So the question is, what was wrong with how she did it? I will respond to that, although I'll point out that this court reviews de novo. I don't understand that. Why is our review de novo of the district court? I did not understand. It seems to me that if you have findings of the district court with regard to what's a fact, i.e., ultimately it's a state of mind of the prosecutor, why isn't that a fact like any other fact? Well, Your Honor, it is not a fact. It is a mixed question of fact and law. It is the application of a legal standard to facts. But beyond that, my response would be that this court's precedent is very clear, that she reviews de novo a district court's decision, denial of a habeas corpus petition, and specifically to that statement doesn't apply to findings of fact made after an evidentiary hearing. In the habeas case. I'm just saying it's not, you know. But there was an essence. You're right, if there had been an evidentiary hearing. But there was an essence in evidentiary hearing. I'm sorry. There was an essence in evidentiary hearing. There was a set of findings that were not made before the district court by the state court and weren't made by the state court and were based on the record and were a factual finding, it seems to me. I mean, in a Title VII case, the question of what the state of mind, what motivated the employer is a fact. Why isn't this a fact? The case law, I think, makes a pretty clear distinction. I have to say, this never has come up, and so it's not briefed here. I'll be glad to say. Maybe it should be, because it seems to me to be fairly basic. And I understood your brief, but it didn't seem right to me. You know, but on the other hand, you say, you know, the general rule in habeas cases is to no over review. And almost every case involves a district court reviewing the state court trial record. Right. So. And in this case, it's no different. I mean, looking at a jury questionnaire, the jury questionnaire really is to look at as part of the state court trial record. There should have been. Yes. So it's really doing nothing more. It means district court than reviewing the state court trial record. And in most of those situations, we review the noble. I think the I think the theory is, well, we can review the record just as well as the district court. And that is not the theory behind the de novo review of habeas habeas judgment. Yes, Your Honor. And exactly that is true here. Let me say that when I commented at the beginning about some of these cases demand more time than this is one of them. And I'm not going to stop you. So keep going. I've almost. We're talking about this. OK. Let me respond directly to your question. You know, what I said, what I've said so far, I think Judge Tashima's point speaks to. And also, as I said, I think this is a matter of a mixed question that with no different deference is given. But putting that aside, I'll take on the district head on. The district court found that in the case of Marceline Combs, one of the African-American jurors who was excluded. And the one that I want to focus on here. Two of the of the prosecutor's justifications appeared to be pretextual. But the district court said, well, but two of them seem to be right. And that's enough. That stands the Batson case law and this court's case law on its head. The law is quite clear. So problem one is that she was simply wrong about what happens if some of the reasons stand, but not others. That's right. OK. Right. I think Kessler versus Cambra and Snyder versus the recent case of Snyder versus Louisiana make clear that that's not right. That if you have two out of four contextual reasons, that's very good evidence of pretext. Well, I think those cases really say if you have those contextual reasons and you should maybe look at the other reasons a little more carefully. But it's not, again, not a per se rule that if you have some contextual reasons, you're out. Right. I think that that's fair. It's not a per se rule. But for instance, in Snyder, they only looked at one reason. They didn't even bother to see if the second reason was valid or not. They said, OK, there is a contextual reason here. That's enough for us. That was the Supreme Court recently. And here with regard to Combs, there were three reasons. The district court thought they were four. I would count them as three. Yes. And as to her analysis of whether those were valid, I think that she was way off base there, with all due respect. The one that was most stringently, the most stressed was the prosecutor's proposed concern that Ms. Combs' daughter had been molested and that she did not say that the molestation would not affect her judgment in this case. Well, to begin with, she did say quite definitely that the molestation would not affect her judgment in this case. And that misrepresentation of the record by the prosecutor itself undermines his credibility. But more importantly, the whole question of the abuse suffered by the jury's daughter couldn't, wouldn't have been a problem for the prosecution. The defendant in this case strangled a young woman to death. If her daughter's molestation gave Ms. Combs bias, clearly it would have been in favor of the prosecution. The State now says that Ms. Combs might have harbored sympathy for the molester because it was her stepson. I'll point out that the prosecutor didn't say that. And actually, in all the years that we've been litigating this case until we got to this court, the State has said that that's a very illegal act, because the record absolutely contradicts it. There's nothing in the record to support the notion that she was concerned, especially with the stepson. The stepson had lived with them for a total of about two months. She repeatedly expressed concern specifically about her daughter. But the other really significant point is that the prosecutor did leave on an African-American juror, juror number six, even though that juror was a non-African-American. Thank you. Even though she and her child had been the victims of domestic violence. Even though juror number six really did equivocate about whether that would affect her judgment. And even though that juror, unlike Ms. Combs, expressed sympathy for the perpetrator and did make excuses for him. If we apply comparative juror analysis... Wasn't there also one juror who specifically said that she would, because of her experiences with her friends who had domestic violence problems, that she would definitely have more, absolutely have more sympathy for the victim and so on? Yes, Your Honor, there was. I believe that woman was a friend of the woman who was killed and was sort of infamous for objecting. You know, the same comparative analysis puts the lie to the justification that Ms. Combs wanted the lawyers to conduct themselves in a professional and reasonable manner. I don't even know that that was a justification. But if it was, it applied to juror number one. I mean, the State says, well, juror number one didn't say as much about it. But that's because juror number one was not questioned as completely as Ms. Combs. And what this Court's case is, most recently Green v. Lamarck in this case, is that that kind of a disparity in questioning is itself proof that the supposed justification was really just an excuse. So the district court found this overall issue suspect, although not, she thought the criminal, involvement in the criminal system was separate. And then she thought that the, I'm just trying to summarize so we can get to a core. And she thought that the issue about the professionalism of the lawyers was pretextual. But she thought there was something in this judgment idea. Right. So do you want to talk about that? I'm not sure I've looked at it. Ms. Combs explained on her own prompting, and that's contrary to what the prosecutor said. She said, well, you know, I hesitated about judging because my religion teaches that you can't I'm not allowed to judge someone else's fundamental work. I'm not allowed to make this sort of judgment. But she immediately said that that wouldn't have anything to do with what my job would be here. I have no problem weighing the evidence and determining legal guilt or a lack of guilt. The prosecutor did not ask her a single question about that. Again, Green reiterates the discourse cases and Miller L's point that if the prosecutor is really concerned, he's going to ask about it. But not only didn't he ask her about it, he didn't ask jury number three. He gave a truly equivocal response about whether his religious beliefs would affect his judgment. All that the prosecutor asked jury number three is, well, but did you judge this case? And he said, yeah, I think so. The prosecutor in this case was very smart and very sophisticated. He didn't make the sort of overtly racist statements that were found in Kessler and Miller L. But when the record is analyzed using the tools provided by those cases, it tells us that once again, a California consciousness was eliminated. Can I ask one last question on this, and then we will ask you to sit down? You're concentrating on Combs, and the question is, what do you make of the Jefferson strike? I gather your basic approach is that it's at least somewhat marginally more justifiable. But how does it feed into the Combs strike? I had a hard time hearing you, but I think you're talking about Daryl Jefferson. Right. I didn't want to get into Daryl Jefferson just because Daryl Jefferson was questioned at more than twice the length of any other juror. So there's so much material there. No, I understand that. What I'm suggesting is that I understand that essentially you're saying, well, it's more arguable, at least, with regards to Jefferson. One of the problems with Jefferson is that the prosecutor was operating with a erroneous factual premise about what the brother had done, and that's not his fault, so it seems difficult to fault him for it. I know you tried to, but it seems difficult. So, but the question is, does anything, even if we were to assume that the Jefferson strike were not on its own, the substantiated Batson claim, does it feed into this in any way? It does. As I pointed out, you know, we can put aside the erroneous, tightly disingenuous statement about Mr. Jefferson's brother being a criminal defense attorney when he was actually exactly the opposite. Yeah, but reading the record, that's what you would think. The fact is that Jefferson was confused. Well, but the prosecutor, like I said, I don't want to chase that around. I think I addressed it in the brief. But the other justifications that the prosecutor gave for eliminating Mr. Jefferson, the ones that he gave before he even started talking about criminal defense attorneys, were patently pretextual. And some of them really didn't even rise to the level of a rationally connected justification. And the way that that, as this Court reviewed in the Kessler case, where you don't have to get into whether or not Mr. Jefferson's exclusion was based on racial discrimination. You can look to see if there is any evidence within the prosecutor's process there. And that helps reinforce the conclusion that Ms. Combs' exclusion was, in fact, done for reasons of racial discrimination. All right. Thank you, Mr. Cutchins. We'll give you about a couple minutes to rebuttal. And we'll give you about 18 minutes, because that's what we had with Mr. Cutchins. I will go ahead and address the record real quickly. By the way, do you agree with Mr. Cutchins' statement about these juror questionnaires never having gotten to the district court? The only juror questionnaires that got to the district court were Combs and Jefferson. The two. All right. So when the district judge said she reviewed all the juror questionnaires, she just meant two. She must have. Yeah. Because that's my understanding. What the state submitted as part of our exhibits were just those two questionnaires. And I believe that was submitted as part of the exhibit. As far as the question as to whether the district court findings are entitled to deference, really, you've caught me off guard with that question. My understanding is that a district court's denial of petition for an obedience corpus is reviewed by this court de novo. And that's my understanding as far as this goes. All right. So if that's the common understanding of the parties at this point, at least in this case, that's probably what we're going to do. But since there's no issue with that. And so I'll go straight into the Gaffin discussion. And I'm going to pretty much just concentrate on Ms. Combs, because it seems that an appellant has concentrated his argument on her as well. And as to Ms. Combs, it appears that it sort of centers on this, one of the prosecutor's reasons, which was that her equivocation regarding whether she was. Well, let's back up a minute. What about the, this is why I was trying to get the arguments as clear as I could. And one of them is simply that if there are some contextual reasons, as the district court found, or some that don't stand up, that the case law supports the proposition that, at least if they're significant, that's sufficient for Batson. You don't, in fact, the others might stand up, doesn't matter. Do you agree with that as a proposition of law? I actually will back up one second. And I actually disagree that the district court found the reasons to be contextual. When she conducted the comparative juror analysis, she did find that the record maybe somewhat undermined two of the prosecutor's reasons. But she didn't go so far as to say that she found that they were discriminatory. And she looked at the balance of the record, and she found that overall the prosecutor's reasons were race-central. As far as if we were to find one or two of the prosecutor's reasons to be contextual, although it's an unsolved area of law, I would argue that the mixed motive analysis would apply, which is that if the state can show that the prosecutor would have struck the juror based solely on the race-neutral reason. How can you show that? Assuming, you know, there's stuff to rule. How could you show that? It's a discrete thing. Well, if we assume, I mean, it depends on which reason the court were to find was pretextual. Let's assume that it found that the molestation incident and her equivocation regarding whether she could be fair because of that, and also the fact that her family was involved in the criminal justice system as a result of that. I don't see why that's a mixed motive problem. It seems to me that it's a problem of saying this is a way of trying to find out whether she was really doing it for the reasons she said, and if she's giving reasons, some of which are not true, you could conclude that she wasn't doing it for the reasons she said. It isn't so much that some of the reasons stand up to comparative analysis, and that proves it was one of her reasons as opposed to what proves – I'm not sure it's – I mean, it's an interesting idea, and maybe so, but I'm not seeing it as exactly the same problem. Well, do you have some authority for this mixed motive analysis? It's not necessarily really clear. In the broader equal protection context, the United States Supreme Court has applied this mixed motive analysis where both permissible and impermissible. One thing is just so you know this, your office is taking completely variable positions on whether there is a mixed motive analysis under Batson, and you're the third person who has stood up before me and taken a different position, and it's a little bit disconcerting. It's a big office, and unfortunately it's hard to sometimes get everybody under. Would your office's obligation be then to persuade the court which motive was more predominant than the other? You know, the safe position is that all of the motives regarding Ms. Combs and Mr. Jefferson were race neutral, and I've set forth my reasons for that in pretty detailed detail. You know, there is no – you agree with me. There is no – well, maybe not no case, but there is no Supreme Court case that applies a mixed motive analysis to the Batson area, is there? That's true. All right. Just a minute, so let me make my point, so. Aren't you as bound by it as the petition? In other words, you can depend only on clearly established Supreme Court law? And is that proposition not clearly established by the Supreme Court? Does it work both ways? That could be an argument, yes. But I will point out that in Snyder, the court did leave this open. They didn't address whether mixed motive would apply in Batson, but they did suggest it is. But Mr. Kessler is telling us that whether mixed motive in general applies or not, there is case law in this circuit, Kessler in particular and others, which do take the position with regard to our particular problem, i.e., if there are some protectional reasons and some not protectional reasons, that that can be a basis for finding a discriminatory motive. That's sort of different than a single discriminatory motive, which is different than a mixed motive. Do you dispute that that case law exists or that it applies? No, I don't dispute that. I think one of the cases he cited had to do with four reasons given by the prosecutor. They found two of them to be pretextual, and they said that aren't. All right. So for now, that's how we have to proceed, right, on that thesis? Well, then, let's go ahead and presume that that is how the Court has to proceed. So if I can address the reasons regarding Holmes. Regarding the molestation incident, the prosecutor seemed to combine those reasons, and those were because she seemed to equivocate regarding whether she could be fair. You know, when she was asked if it would affect her judgment, she sort of said, well, I don't think so, I don't know. There were pauses, and she kind of did this back and forth. At the end of the trial court's questioning of her, she said that, no, it wouldn't affect her. But our position is that the prosecutor didn't have to credit her later negative response, that it could. As to which issue now you're talking about? As to the. Equivocation regarding whether the molestation. But it is true. I read through most of the bond hearings last night, and everyone is talking that way. I think, I'm pretty sure, I'm going to try. Yeah, and our position is that hers was a little different. Everybody else said, you know, if they were asked, could you be fair, yeah, I think I can be fair. Whereas hers was more than that, went beyond that. There was not only the sort of I don't know, I don't think, but there was also pausing and sort of going back and forth. Which we're going to, we're having to interpret from the record by the gashes and all that, of course, when we weren't there, so we can't necessarily see that. And there were no comments made about that. But then you have this woman who said definitively that it was going to affect her, and nobody seemed to care about that. That. She was absolute about it, that the fact that her friends had these domestic violence issues was absolutely going to affect her. The young woman who had the friend that was killed in the dog molestation? Yes, but she had several friends, she said, who had domestic violence issues. The difference there is that all of her friends were victims. Whereas in this case, and the prosecutor didn't necessarily pick up on this, didn't say that this was. Exactly, she didn't care about it. The molestation incident did involve two family members, both the perpetrator and the victim. That seems like a complete name-wake. Nobody has ever mentioned it, and this stepson was, she referred to him as something like another lady's son. And the only reason why we responded. She didn't even call him a stepson. The only reason why we responded in a brief about that was because a parent said that the only reason. Yes, but I'm saying she didn't even refer to this person as a stepson. She didn't even regard him as a stepson. She referred to him as something like another lady's son. Her husband's son from another relationship. There was no indication that she related to this child as in any way related to her, except somebody who lived in her house for three months. But I think the broader point here is that if you accept that she equivocated about whether it would affect her judgment, the prosecutor didn't have to guess in which way she might be biased or how deep her relationships went with these people. Even if he had questioned her about her relationship with this stepson, well, he was a stepson. Although she didn't characterize him that, you know, that was what he was. Although there was no questions, even if he had questioned her and she had said that, you know, it wouldn't affect her, he could have still taken that hesitation, her initial hesitation. He didn't know which way she was going to be biased. He didn't say that. You said it. Excuse me? He didn't say that. You said it. Well, as far as the equivocation, he was worried about the equivocation. He didn't go so far as to say why. But he was concerned about that. And the other thing that he was concerned about with regard to the molestation incident was that the family, the family went through this criminal justice system. The stepson was prosecuted for it. He was put on probation, I believe, and he was asked to stay or there was an order for him to stay away from his stepsister. So those two things combined concerned the prosecutor. And I will point out that he struck a non-African-American prospective juror who had the identical situation. His son from a previous marriage molested his daughter from his current marriage. It was his son, and he may refer to it as his son, and he related to the son. But the point is that there were two people involved in the same family that went through a criminal justice system, and he also indicated that he would be biased in either way. So he is more similarly situated to Ms. Combs than the non-African-American jurors who actually sat. They may have had similar domestic violence situations in their background, but it didn't go so far as to go through the criminal justice system, and those jurors were not as equivocal about whether those situations came up. I thought the woman whose husband pushed her. That's correct. That's who appellant claims is more similarly situated to Ms. Combs than the prospective juror, Whitney, who was struck for the same exact reasons that had the identical background as Ms. Combs. Now, we would say if you look at the juror that was left to sit and the prospective juror that was struck like Ms. Combs, whereas the prospective juror is identical to her, that should have some weight in this court's opinion. Does it have any weight that the only two African-American jurors in the jury pool were struck? You know, in looking at the totality of the record in other cases, there have been times when they've pointed out that the number of jurors fed into the court's opinion. In those cases, though, we're talking like 10 of 11, I believe it was, in Miller L., and I believe there were six jurors in the more recent Green case. Here there were two. They were the only two. It could be a consideration. I don't know if it's determinative. Now, I would say to the court that based on just my previous argument regarding what's just happened, I think we've shown in our brief that the other two reasons given by the prosecutor to strike Ms. Combs were also race neutral. Combined with the fact that all four reasons given to strike Mr. Jefferson were also race neutral, all of these combined on balance show that the prosecutor did not strike Ms. Combs based on her race. Okay, let's go through on this judgment notion. I mean, first of all, he actually misstated the circumstances. I mean, she raised this on her own. As far as I can tell, she was simply being thoughtful, but she was quite clear that she understood the difference and that her religious understanding of judgment was different than this and it wasn't going to be a problem, and so what was the problem? Okay, the problem was, and let me give some context here. She was being questioned at the time by the defense attorney, and he asked her if her religious beliefs would prevent her from judging in this case. I don't know exactly how it was put. I'm sorry if I'm incorrect. I don't mean to misrepresent the record, but he was asking her about her religious beliefs, and she hesitated, and the defense attorney specifically pointed that out in the record and was concerned enough that he followed up on questioning her and questioned her quite extensively about this difference between, she made a very careful distinction between judging somebody or making a decision based on evidence versus judging somebody not based on evidence and how she couldn't do that as a religious adherent, but she could make a decision based on evidence. The defense attorney became a little concerned and started going into this whole line of questioning regarding, well, what if there's maybe, you know, we don't always put all the evidence, and maybe there's a piece of evidence missing, how would this affect you? And she says she would take that into consideration. The prosecutor, you know, an appellant points out the prosecutor didn't question her about that, but there was no need to because the defense attorney went so, he questioned her so extensively that there were alarm bells raised already, and it's our view that the prosecutor, this doesn't show that it was pretextual just because he didn't question her on this. Well, what was the alarm bell? Well, that she brought up this sort of, she hesitated before answering whether her religion would affect her. And said it wouldn't. And then she went on and made a distinction. Well, I can't judge as part of my religion, but I think it's different basing it on evidence. Now, again, the prosecutor didn't have to accept that, you know, she could make this distinction, this careful distinction during trial. He could be quite rightly concerned that maybe she would have problems judging anyone based on her religious background. And so, again, we would state that that was another race-neutral reason. And the comparative juror analysis does not undermine that reason. See, one of these problems we have with this type of a case, we don't know the demeanor of the person being questioned. The prosecutor considers it to be equivocation. Another person may consider it to be she's a rather reflective person who reflects before responding to questions, expressing her thoughts as she's reflecting. How do we handle that? We really don't know. The word is there, so to speak. Right. As far as the point I was just making with regard to her religious beliefs, the defense counsel actually did point out on the record that she did hesitate before she answered. So we do have that demeanor finding on the record. That may be her nature, her personality. Well, but he was concerned enough about it that he asked her about her hesitancy, and she didn't dispute that she was hesitating because of her religious beliefs. And then she did go into a discussion about why she was having difficulty answering that question. So I think that's fair inference from that. As far as demeanor, you know, again, he didn't necessarily he was basing it on her responses, not necessarily. This wasn't a case where he said, oh, she looked nervous to me. He didn't necessarily make a demeanor-based, didn't present a demeanor-based reason. The reason regarding the equivocation you can see from the record that she did tend to go back and forth. I don't think so. I don't know. And the court reporter did note that with some dashes that there must have been some pauses. Again, that's an inference I'm drawing from the record. And that's your concern about, as far as the demeanor, that that is an issue. The trial court is the only one who is there who makes all these things. Would you wrap up? Please cancel. Okay. So basically, you know, our position is that the prosecutor stated race-neutral reasons, all of his reasons for striking Combs and Jefferson were race-neutral, and that the record as a whole supported the trial court's finding. And that's what the court votes to pass. Thank you very much. Thank you. Okay. Mr. Cushon, you've got your minutes. Your Honor, I'll be brief. The senator's counsel has made arguments. I don't really feel a need to respond very much. Regarding the representation to the record, I'll point out that, as for what this report said, she said unbalanced juror analysis calls into question, too, the prosecutor's preferred justification. However, the other two justifications were equally applied to other unchallenged non-minority jurors, and therefore they support the finding that the prosecutor's use of the peremptory strike as to Combs was race-neutral. That's on page 22 of this report's decision. All I'll say about a mixed motive analysis is there's absolutely not only was it never argued any time in this case, there's no predicate for it. This isn't a case where, you know, a guy told off his boss but also might have been fired for some other reason. The thing about Ms. Combs equivocating, Ms. Swanson says that, well, the prosecutor didn't have to accept her final word on it because she said, well, I don't know, I don't think so, and then she said no. But it's not that he didn't accept it. He represented that her final word was that she wasn't really sure. Her final word was an equivocation. Her final word was definitely no. He misrepresented her directly in that regard. But the most important thing about the equivocation is, so what? Even if she had, there is absolutely no indication that she would have been sympathetic to the defense based on what happened to her daughter. The prosecutor had no legitimate concern about whether she was either neutral or in his favor. Juror number six, however, really did equivocate and really did express sympathy for the person who had committed domestic violence. As for whether two jurors being struck is enough, this Court has repeatedly found in several cases, Williams and McClain. I was kind of looking at it the other way. I mean, is the fact that there were two, even though we're only focusing on one, is the fact that there were two and they were the only two, at least lend some credence to the pretext notion. We usually look at that at the front end, but I don't know what the case law is about feeding it into the final conclusion. Feeding it into the final conclusion as to whether there was pretext. I would only submit that that supports the inference. And I think it's a very strong inference of the inference. Okay. I think you are into the black, so go ahead. I've got one more thing to say, which is about the prosecutor may not have needed to ask her about it. He didn't ask juror number three, who was a Jehovah's Witness, anything about it except could you do your job. And he said, well, I believe so. I think that that's ample equivocation and that that supports a finding of pretext based on fact. Okay. Thank you very much, counsel. Your argument is useful. And the case of Almey v. Hickman is submitted.
judges: Tashima, Berzon, Timlin